1                    IN THE UNITED STATES DISTRICT COURT

2                       MIDDLE DISTRICT OF NORTH CAROLINA

3
    UNITED STATES OF AMERICA     )   Case No. 1:12CR123-1
4                                )              1:12CR399-1
        vs.                      )
5                                )   Greensboro, North Carolina
    KRISTEN DOUGLAS WELTER,      )
6                                )   May 30, 2013
        Defendant.               )
7   _____)   9:26 a.m.

8

9                        TRANSCRIPT OF SENTENCE

10          BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.

11                    UNITED STATES DISTRICT JUDGE

12
    APPEARANCES:
13
    For the Government:  GRAHAM GREEN, AUSA
14                       Office of the U.S. Attorney
                         251 N. Main Street, Suite 726
15                       Winston-Salem, North Carolina 27101

16

17  For the Defendant:   LISA S. COSTNER, ESQUIRE
                         200 Brookstown Ave., Ste. 304
18                       WINSTON-SALEM, NC 27101
                         336-748-1885
19

20
    Court Reporter:      Joseph B. Armstrong, RMR, FCRR
21                       W. Market, Room 101
                         Greensboro, NC  27401
22

23

24          Proceedings reported by stenotype reporter.
          Transcript produced by Computer-Aided Transcription.
25

Case 1:12-cr-00399-WO   Document 36   Filed 09/30/13   Page 1 of 74

```
1                    P R O C E E D I N G S
2              (At 9:26 a.m., proceedings commenced.)
3              THE COURT:  You may proceed.
4              MR. GREEN:  The first matter is United States
5    versus Kristen Douglas Welter.  It's 1:12CR123-1 and 399-1.
6    It's on for sentencing.
7              THE COURT:  All right.  Thank you, sir.
8    Ms. Costner, good morning.
9              MS. COSTNER:  Good morning, Your Honor.
10             THE COURT:  Are you and Mr. Welter ready to
11   proceed?
12             MS. COSTNER:  Yes, Your Honor.
13             THE COURT:  All right.  Well, let me make one
14   thing.  I think where we stand -- I raised an issue last
15   time about the one point, and Mr. Green wrote what I thought
16   was a pretty persuasive brief on the subject and then
17   conceded that under the facts of this case they couldn't
18   prove the one point, I think is the way I understood it.  So
19   I assume there's no objection from the defendant on that
20   issue.
21             MS. COSTNER:  No, Your Honor.
22             THE COURT:  So who's here -- good morning,
23   Ms. Meyers.  I will go ahead, based on my research in the
24   Government's position, and remove the one point that was set
25   out in paragraph 53 of the presentence report and apply it
```

1    under Section 4A1.1(e).  I do not -- I'll tell everybody, I

2    do not anticipate running into this very often under the old

3    Fair Sentencing Act, but it comes up pretty regularly under

4    structured sentencing, it seems like, these days.  So keep

5    in mind the issues that can arise when there are offenses

6    consolidated for judgment under the current state law.

7            Now, where does that leave us in terms of

8    objections at this point, Ms. Costner?

9            MS. COSTNER:  Your Honor, I did not file anything

10   additional to what Mr. Chamberlin filed, but, you know, he

11   made two factual objections which have no impact at all on

12   Mr. Welter's guidelines, but they are two objections

13   Mr. Welter does feel strongly about and would still want at

14   least those put forth.

15           Mr. Chamberlin objected to the enhancement for

16   obstruction of justice.  I read his memorandum and wouldn't

17   add anything to that in terms of any legal research.

18           And then Mr. Chamberlin opted not to address the

19   acceptance of responsibility component in light of the

20   projected motion to withdraw the plea to the child

21   pornography charges.  I understand the law as it stands as

22   far as -- as that goes.  I would just say to the Court on

23   behalf of Mr. Welter that he did accept responsibility for

24   the gun charge and would just want to point that out to the

25   Court, but I understand the law as it applies in that case.

US v. Welter - Sentence - May 30, 2013

1    I believe those were all of the objections other

2 than the one point for the criminal history, and I'm not

3 intending to put on any evidence with respect to the factual

4 objections except just to echo that, again, Mr. Welter does

5 feel very strongly about these factual discrepancies.

6    THE COURT:  All right.  For some reason I remember

7 it seems like one of them was -- I can't find it in the

8 pleading.  Let's see.  Who disputed -- it seemed like there

9 was objections one and two.  I'm sorry, for some reason,

10 Ms. Boggs [sic], I'm having trouble running down those

11 factual objections.

12    MR. GREEN:  There were two.  One related to the

13 question of whether when first interviewed by the FBI he

14 denied -- he indicated he was Christian, and the second was

15 related to when the agent came to his door on the gun

16 purchase whether the agent asked him to go get the gun or he

17 brought it out voluntarily.

18    THE COURT:  All right.  That flowed from the

19 presentence report.  That's right.  That's what it was.

20    Okay.  Objection Number One, defendant denies that

21 he described his religious beliefs as Christian.  I

22 understand Muslim component, and, frankly, it doesn't make a

23 difference to me in terms of sentencing or anything else,

24 Muslim, Christian, what he may have told law enforcement

25 officers at the time, so I will not consider that fact in

Case 1:12-cr-00399-WO   Document 36   Filed 09/30/13   Page 4 of 74

1    any way in imposing a sentence or -- in determining a
2    sentence or calculating the guideline range.
3              Paragraph 8 the presentence report.  I've
4    forgotten what the circumstances were on --
5              MS. COSTNER:  Your Honor, that was when the agent
6    first interviewed him in March of 2012, and it's
7    Mr. Welter's contention that the agent brought up the
8    subject of the firearm, not Mr. Welter.
9              THE COURT:  And I -- that's right.  I don't
10   really -- the PSR says Mr. Welter stated he wanted to
11   purchase a semiautomatic .22 caliber handgun with a 9-inch
12   barrel.  I don't know whether Mr. Welter bought it up or the
13   agent brought it up or where it came up, but I don't find
14   that fact to be relevant to the calculation of the guideline
15   range.  Does he deny completely that he discussed with the
16   agent the purchase of a 9-inch .22 caliber?
17             MS. COSTNER:  No, Your Honor, not at all.  It's
18   just who initiated the conversation, and it was his
19   contention that it was the agent not him.  But certainly
20   once the subject was brought up, he participated in a
21   discussion about it.
22             THE COURT:  All right.  Well, I at this point in
23   time don't find the person who may have initiated -- the
24   fact that the agent or Mr. Welter initiated the discussion
25   to be a fact upon which I will rely on in determining the

US v. Welter - Sentence - May 30, 2013

1  guidelines or in determining the -- an appropriate sentence

2  in the case; and, furthermore, I'm not sure whether I --

3  that I read the report to specifically or implicitly suggest

4  Mr. Welter initiated the discussion.  I don't know how that

5  discussion may have come up from what I read in the report.

6         That's not a commentary on either Mr. Welter or

7  the FBI agent.  I just don't read the report to clarify who

8  may have initiated what in terms of that discussion, so I'll

9  find those two don't need to be resolved because they have

10  no impact on either the guidelines or the calculation of an

11  advisory sentence.

12         Now, in terms of the objection to the obstruction

13  of justice that has been imposed here, I don't understand

14  there to be any objection to the facts, that is, that

15  Mr. Welter contacted a neighbor and asked him to destroy two

16  hard drives.  Is that correct or incorrect?

17         MS. COSTNER:  Well, the letter said, you know --

18  in addition to many other things that he asked his neighbor

19  to do, he said if you find hard drives, throw them away.  I

20  don't even believe he said destroy them.  I think it was

21  just throw them away.  You know, I would just point out to

22  the Court at that time the house had been searched,

23  computers had been seized.  Mr. Welter had no idea whether

24  those hard drives had been seized or not, and so I would

25  just contend that his -- it was if you find them, throw them

1    away, not go seek them out and destroy them or, you know,

2    erase them or anything of that nature.  So it was in a list

3    of water my plants, make sure the lights are turned off --

4              THE COURT:  Your argument relates to

5    interpretation of the facts, not so much the facts that are

6    set out themselves.

7              MS. COSTNER:  Right.  No question that that is not

8    mentioned in the letter about the hard drives.

9              THE COURT:  All right.  And then I think the

10   Government set forth an additional argument.  I'm sorry.  I

11   have a number of papers in Mr. Welter's case.  The

12   Government contended in its response that Mr. Welter denied

13   that he was, in fact, guilty of the child pornography

14   offense to which he had previously pled guilty based on

15   answers given during the psychosexual evaluation.

16   Obviously, at this point in time Mr. Welter's testimony in

17   terms of withdrawing his plea had not been offered to the

18   Court.  And then the Government also contends that the

19   destruction of the two hard drives or the instructions to

20   destroy the two hard drives constituted obstruction as well.

21             Do you want to be heard on the second argument as

22   well?

23             MS. COSTNER:  In terms of the denial of --

24             THE COURT:  Yes.

25             MS. COSTNER:  -- guilt to -- Your Honor heard the

US v. Welter - Sentence - May 30, 2013

1    testimony and the argument at the motion that this is based

2    on Mr. Welter's contention that he did not know that these

3    files or these images were on his hard drive.  He did not

4    deny their existence, but just the knowledge.  They were in

5    temporary internet files.  They had not been accessed since

6    2007, 2009, so for many years.  This was a separate hard

7    drive, not a part of an ongoing computer.

8             So his defense, had he been allowed to have a new

9    trial, would have gone to knowledge and knowingly having

10   these images on the hard drive.  So I would contend that

11   that's a little different than saying, well, I don't know

12   how that hard drive got there, that must have been someone

13   else's hard -- you know, clearly, they were in a file with

14   his, you know, kristenwelter/internetexplorer/temporary

15   files, and then the AVI was in the RealPlayer file also

16   under his name.  So it would have gone more to the knowledge

17   element, and I'll contend that makes it a little bit

18   different.

19             THE COURT:  All right.  Did you want to be heard

20   further on the first part?  I didn't mean to cut you off.  I

21   understand your argument on interpretation of what was meant

22   by that note.  Go ahead.

23             MS. COSTNER:  I'm sorry.  I didn't mean to

24   interrupt, Your Honor.  Mr. Chamberlin, I think, briefed it

25   and set out the law and his contentions in his memorandum,

1    and I would just contend in light of that and the fact that

2    the letter to the neighbor was not specific only as to the

3    hard drives, it involved other activities, that really at

4    the time Mr. Welter's house had been searched.  It had been

5    searched pursuant to a search warrant, and Mr. Welter at

6    that point had been in custody since that time and really

7    had no idea if, you know, hard drives had been seized or not

8    seized or computers had been seized or not.  It was more of

9    an if you find, do this, not please go into this desk into

10   this locked drawer and do this.  It was not a specific.  It

11   was more of a conditional.  If you see it, throw it away.

12           And so I would argue that that makes it a little

13   bit different than directing somebody to go to a particular

14   piece of evidence perhaps hidden in a place or something

15   like that, especially in light of the fact that this house

16   and the outbuildings and everything had been searched

17   pursuant to this search warrant and searched very

18   thoroughly, and, you know, he could have just as easily have

19   assumed that the FBI had gotten all these items.  He had no

20   way to know since he was not present, he was in custody.

21           THE COURT:  All right.  Mr. Green, I understand

22   the two arguments.  I assume the Government still urges both

23   grounds in support of the obstruction --

24           MR. GREEN:  We do.

25           THE COURT:  -- enhancement.  In terms of the

1  destruction of the computers, the application note says:

2          "This adjustment applies if the defendant's

3      obstructive conduct occurred with respect to the

4      investigation, prosecution, or sentencing of the

5      defendant's instant offense of conviction; and, B,

6      related to the offense of conviction and any

7      relevant conduct or otherwise closely related case

8      such as that of a codefendant.

9          Obstructive conduct that occurred prior to

10     the start of the investigation of the instant

11     offense of conviction may be covered by this

12     guideline if the conduct was purposefully

13     calculated and likely to thwart the investigation

14     or prosecution of the offense of conviction."

15         There's a little bit of a component on destruction

16 of the hard drives -- any hard drives you find in that we

17 had the -- we'll call it the security investigation that

18 started and culminated with the 922(g) offense, and then we

19 had the second report from a neighbor who is asking to

20 destroy the hard drives.  That leads to this instant offense

21 investigation.  So I'm not sure how exactly to classify what

22 he did.

23         In other words, if a defendant commits an offense

24 and throws some of the evidence away before an investigation

25 starts, then that doesn't constitute obstruction, I don't

1  think, under this guideline application; but if

2  investigation has started, and he's destroying evidence to

3  try to avoid detection of the offense, then you've got a

4  different circumstance.  Here it's kind of right on the

5  line.

6         MR. GREEN:  Right, and I think it's that second

7  part of the guideline having to do with an offense -- the

8  instant offense.  When it refers to the instant offense, I

9  mean, the child pornography offense.

10        THE COURT:  Right.

11        MR. GREEN:  I would liken it to if there was a

12  fraud investigation, and they came through and collected a

13  bunch of files in a fraud case, but a defendant also had

14  whatever contraband, illegal narcotics, whatever it is, and

15  said, hey, you know what, they may come back, we need to go

16  ahead and destroy that as well, that's going to be

17  obstructive conduct; and I think that's what the guideline

18  calculates or anticipates.

19        THE COURT:  Well, that's not -- the controlled

20  substances aren't really related to the instant offense and

21  the fraud.

22        MR. GREEN:  Well, I understand, but I don't think

23  that's what's required under the guidelines.  I think the

24  guidelines pretty clearly contemplate the first section

25  being related to the offense of conviction and relevant

1   conduct or related offense; and then if it was purposefully

2   calculated or likely to thwart the investigation of the

3   offense of conviction.  So I don't think there's -- in other

4   words, I don't think the obstructive conduct when you have

5   two offenses of conviction relates only to one and can only

6   relate to one, if that makes sense.

7           THE COURT:  That's what I'm struggling with.

8   Relevant conduct is all acts aided, abetted, counseled, and

9   procured in preparation for the offense of conviction,

10  during the commission of the offense of conviction, or in an

11  effort to avoid detection for the offense of conviction in

12  circumstances other than jointly undertaken conduct.  So

13  it's preparation for, commission of, and avoiding detection

14  of.  That's the definition of relevant conduct.

15          MR. GREEN:  Yes, sir.

16          THE COURT:  And your example, possession of a

17  controlled substance, unless there's some relationship to

18  the fraud, really isn't conduct that's committed in

19  preparation for, during the commission of, or to avoid

20  detection of for the offense of conviction.  So I'm not sure

21  I necessarily agree.  I'm not saying I disagree, but I think

22  it's a tougher argument to say controlled substances or

23  child pornography in this case is relevant conduct to the

24  offense of conv -- or the offense of investigation.

25          So it seems to me the obstructive conduct --

US v. Welter - Sentence - May 30, 2013

1    investigation, prosecution, or sentencing.  None of that had

2    started with respect to the child pornography offense at the

3    time they were destroyed.

4              MR. GREEN:  Yes, sir.

5              THE COURT:  So it's -- that's all going on with

6    respect to security issues as well as a gun.

7              MR. GREEN:  Yes, sir.

8              THE COURT:  So is it a closely related offense?

9    Is that what you contend?

10             MR. GREEN:  It is closely related, but if I'm

11   looking at the application note:

12             "Obstruction conduct that occurred prior to the

13   start of the investigation of the instant offense" -- so if

14   the instant offense is child pornography, clearly, this

15   obstructive conduct occurred prior to that investigation of

16   that -- "may be covered by this guideline if the criminal

17   conduct was purposefully calculated and likely to thwart

18   investigation of the prosecution of the offense of

19   conviction."

20             So, you know, as I set out in -- as my paper,

21   there's no question Mr. Welter clearly knew that they were

22   interested in looking at his computer -- computers, and he

23   gave consent to do so.

24             THE COURT:  And they took them.

25             MR. GREEN:  They took them, at least he thought

1    they did; and, of course, he got discovery in the case and

2    would kind of be aware of what was seized and what was not

3    seized.  And so now we have -- now we have -- I'm sorry.

4            THE COURT:  I don't read his letter as having

5    occurred in relation to discovery.  It was they took his

6    computers, he goes to jail or detention, whatever, and then

7    he wrote a letter while he's in jail saying --

8            MR. GREEN:  Yes, sir.

9            THE COURT:  -- go water my plants; and by the way,

10   if you find any computer hard drives, throw those out, too.

11           MR. GREEN:  That's right.  And so the question, I

12   think, for the Court is looking at Application Note One, is

13   it obstructive conduct?  I think, you know, whether it's,

14   you know -- you know, feed the dog, and also get rid of

15   my --

16           THE COURT:  You would disagree with Ms. Costner's

17   suggestion of the implication of the note.

18           MR. GREEN:  Yes.  I think it's quite clearly kind

19   of in a kind of common sense approach, hey, there's some

20   stuff I need you to take care of, one of which is throwing

21   out these hard drives.

22           It clearly started prior to the start of the child

23   pornography offense because they didn't know that there was

24   child pornography existent at the time, and it was

25   purposefully calculated to thwart the investigation of the

offense of conviction, which is the child pornography

conviction. So I think if you -- if you kind of -- almost

if you stripped away the gun charge, if you had the same

contact -- contact with police, they come and seize your

computers, and you subsequently say, hey, we need to go get

rid of that hard drive before there's a charge, it is

calculated to obstruct their investigation into that

criminal offense.

So I think it's -- I don't even really think we

need to be related conduct or relevant conduct because the

Government will acknowledge it's a pretty big gap between

the offense of conviction and, more specifically, what the

Court is aware what they were looking for with regards to

Mr. Welter and the ultimate discovery of the child

pornography. But nevertheless, it is both the instant

offense and the offense of conviction, that is, the child

pornography, and it appears to me pretty clearly that the

guideline would allow application of obstructive conduct

for -- basically something that -- something you did before

the investigation really gets rolling into what you are

ultimately convicted of.

So I think if the Court finds that that was

obstructive conduct, then pretty clearly it's going to

apply. But I'm not going to argue that it's going to relate

under those first prongs of a closely related case or

1    necessarily relevant conduct to the security investigation

2    or the possession of firearm.  Thank you.

3                THE COURT:  All right.  Ms. Costner, I think the

4    problem -- one of the problems that you have here for your

5    client is we actually have two offenses of conviction, a

6    922(g) and this other.  The investigation -- even if you

7    carve out the child pornography, the investigation of the

8    first offense -- or the investigation that led the pros --

9    the prosecution of the first offense was very broad, that

10   kind of security threat type investigation; and during the

11   course of that investigation, I think by the time Mr. Welter

12   wrote his letter, the Government has -- the investigators

13   had indicated an interest in the material on his computers

14   for a variety of reasons, arguably in some respects related

15   to the gun charge in that -- has he communicated about guns?

16   Is there any evidence that he's possessed other firearms in

17   addition to the ones that we've seen.

18               I'm not sure that I find it compelling that

19   computer hard drives were destroyed -- I mean were attempted

20   to be destroyed during the course of that investigation, and

21   the only offense that was later discovered was the child

22   pornography offense.  In other words, it seems to me there

23   is a very broad investigation ongoing.  The Government

24   has -- the investigators have expressed an interest in

25   examining the defendant's computers in relation to that

US v. Welter - Sentence - May 30, 2013

1    investigation; they've taken the ones they found; and then

2    Mr. Welter tried to have a neighbor destroy the remaining

3    computers.  So I'm not sure there is necessarily much of a

4    distinction between the original investigation and this

5    particular case, even though the offenses charged ultimately

6    ended up being separate offenses.

7            What's your response to that?

8            MS. COSTNER:  What I would say to that, Your

9    Honor, is this is a situation where it wasn't just where

10   Mr. Welter turned over computers.  There was a search

11   warrant executed on his residence, and there was a very

12   thorough search.  I've seen the images.  So, you know,

13   Mr. Welter knew that his home had been searched.  He knew,

14   as you said, there was an interest in the hard drives and

15   other -- or any hard drives or any computer -- computers

16   that at the time he wrote the letter, he didn't know what

17   they had found and what they hadn't found.  It was a

18   conditional letter "if you find."  For all he knew, the hard

19   drives had been found and looked at and reviewed by law

20   enforcement and left there.

21           I mean, at this point he doesn't know what they're

22   interested in, what they've looked at or haven't looked at,

23   but they did have complete access to his home.  So it wasn't

24   a situation where they came to his door and said can we have

25   your computers, and he handed them out the door to them, and

1   off they went.  They took them into custody, and they went

2   through everything; and when he's sitting in jail, he

3   doesn't know what they've found and what they haven't.

4           So in his mind easily they could have found the

5   hard drives.  They could have reviewed them.  They could

6   have found nothing on them of interest.  You know, we know

7   that there were things on them of interest, but you also

8   heard that, you know, his defense to this would be he didn't

9   know of the existence of those particular images.  So if

10  they are left in his home, it may be because the law

11  enforcement has either looked at them or has no interest in

12  them at that point in time.  So any request to throw them

13  away could be an innocent request in terms of not trying to

14  destroy evidence of child pornography, but, you know, if it

15  had adult pornography or if it had financial information to

16  destroy it and get rid of it so that somebody coming into

17  the house couldn't have access to it.  That could be an

18  explanation as well.

19          And I would ask the Court to consider that again

20  in light of the fact that law enforcement had access to the

21  entire house, and these hard drives were not in some safe

22  that required a combination.  They weren't in a secret, you

23  know, hideaway place or under a floorboard or anything like

24  that.  I think they were in a drawer where anybody could

25  have found them, and certainly they did a thorough job of

1    looking.

2         As you pointed out, this is a letter that he wrote

3    with a list of things to do not in response to discovery.

4    You know, just I would proffer that he did not receive a

5    list of what had been seized from the house.  That was

6    contained in the discovery.  But, you know, as Mr. Green

7    well knows, we don't get to hand those things to our

8    clients.  We have to sit down and discuss with them what's

9    in discovery, they can maybe take a look at them, but they

10    can't keep what we receive from the Government in terms of

11    discovery.  I don't know whether Mr. Chamberlin had gone

12    over it, whether he had received discovery at that point in

13    time.  But you don't see in the letter, well, the Government

14    didn't get this, so go get it and throw it away.  It's if

15    you find it, throw it away, if it's there, so he didn't

16    know.

17         THE COURT:  Well, the letter was certainly

18    alarming enough to cause his neighbor instead of doing what

19    Mr. Welter asked, he turned the letter -- or whoever got the

20    letter to turn it over to the FBI for their review.  In my

21    mind that at least is some suggestion of the way a third

22    party interpreted what was included in the letter.

23         MS. COSTNER:  Well, and I will say, too, Your

24    Honor, one thing that Mr. Welter wanted me to point out at

25    least at some point in time, and I'll say it now.

1   Subsequent to his arrest, there were news reports and --
2   that made him out to be a terrorist basically.  So, you
3   know, certainly it may be if she saw something about a hard
4   drive, she may have felt uncomfortable given the huge amount
5   of publicity that came along with Mr. Welter's arrest.  It
6   may have had nothing to do with, you know -- I mean, I
7   understand what the Court's saying.  That may have made her
8   uncomfortable in and of itself, not just the letter.  I
9   mean, the letter is -- you know, I've got it here.  It's a
10  little hard to read, but it doesn't -- it just says if you
11  find it, throw it away.  Not go look for it, not seek it
12  out, not, you know, I have it in a hidden safe, here's the
13  combination, anything like that.  It's just in a list of
14  things to do.

15          THE COURT:  Doesn't that then take us back to the
16  original issue, and that is that Mr. Welter attempted to
17  destroy computer hard drives during the course of a
18  terrorist/security investigation?

19          MS. COSTNER:  But there's no evidence on those
20  hard drives there was any information whatsoever that would
21  factually tie him to some terrorist group or, you know,
22  terroristic acts or terroristic knowledge.  So his letter to
23  this neighbor was just these are hard drives that I -- you
24  know, I want you to get rid of, but not -- there's no
25  evidence that he was getting rid of any of that information.

1    I'm just saying that may be what was in her mind at the time

2    as opposed to something about the letter that made her

3    uncomfortable.  The publicity that was attached to his

4    arrest may have made her uncomfortable.

5            THE COURT:  All right.  Do you want me to look at

6    the letter?  I mean, it's described in here.  I'm not asking

7    to.  Everybody keeps referencing the letter.

8            MS. COSTNER:  No, Your Honor, I --

9            THE COURT:  Mr. Green, do you have any objection?

10           MR. GREEN:  No, sir.

11           MS. COSTNER:  It's a little difficult to read,

12   I'll say that.  It's not the best, unless Mr. Green has a

13   better copy.

14           MR. GREEN:  You go ahead, and I'll see if I can

15   find a better copy for you.

16           THE COURT:  I read that number three as "Look in

17   my workroom, and see if you can find any computer hard

18   drives.  If you find any, please throw them away."  Is that

19   correct?

20           MS. COSTNER:  Yes, Your Honor.  I would just point

21   out that law enforcement certainly had access to the

22   workroom along with everything else through that search

23   warrant.

24           THE COURT:  All right.  Do you want me to mark

25   this, or just put it in the file?

US v. Welter - Sentence - May 30, 2013

1          MS. COSTNER:  Your Honor, I can --

2          THE COURT:  You can have it back.

3          All right.  In Mr. Welter's case, I am going to

4   find that the obstruction of justice enhancement is properly

5   applied.  We've talked about 3C1.1:  If the defendant

6   willfully obstructed or impeded or attempted to obstruct or

7   impede the administration of justice with respect to the

8   investigation, prosecution, or sentencing of the instant

9   offense of conviction, and, two, the obstructive conduct

10  related to the defendant's instant offense of conviction and

11  any relevant conduct or, B, a closely related offense,

12  increase the offense level by two levels.

13          I am aware that, as we've been discussing, the

14  application note one, obstructive conduct that occurred

15  prior to the start of the investigation of the instant

16  offense of conviction may be covered by this guideline if

17  the conduct was purposefully calculated and likely to thwart

18  the investigation or prosecution of the offense of

19  conviction.

20          Here, admittedly, it's -- there are unusual facts

21  as set out in the presentence report.  The investigation

22  clearly started in terms of a -- we'll call it a security or

23  potential threat to Homeland Security as detailed in

24  paragraph 6 as set forth in the presentence report at

25  paragraphs 9 and 10.  Agents of the FBI searched the

US v. Welter - Sentence - May 30, 2013

1    defendant's residence; and in addition to seizing the

2    revolver and ammunition, they also seized ammunition that

3    apparently was something different from the actual gun found

4    present, .410 shotgun shells, and then 92 rounds of various

5    ammunition.  That occurred on March the 22nd, 2012.  As

6    detailed in paragraph 11, during the search of his residence

7    on that day, Mr. Welter provided consent to search all

8    computers located in the residence, which apparently the FBI

9    did.

10         However, on April 13, 2012, FBI was made aware of

11   the existence of two hard drives that had been located in

12   Mr. Welter's -- that were in Mr. Welter's residence but had

13   not been found during the course of the original search.  As

14   we've been discussing, Mr. Welter had sent a letter to an

15   individual asking that that individual locate the hard

16   drives -- or check in a workroom, as I read, and if there

17   are any hard drives to throw those hard drives away.

18         It seems to me at that time there is an

19   investigation involving -- that's clearly known to

20   Mr. Welter and is ongoing with respect to several different

21   areas of conduct, areas at issue, including his possession

22   of the firearms under the circumstances described in

23   paragraphs 5 through 8 in the presentence report.

24   Mr. Welter's efforts to destroy evidence under those

25   circumstances, even though that is unusual, I find is

1   properly classified as obstructive conduct in this case,

2   that is, an effort to willfully impede.

3           I understand Ms. Costner's argument with respect

4   to what might be construed as the benign nature of his

5   comment about destroying hard drives, but I find the

6   destruction of hard drives, one, to be very different from

7   the other acts that Mr. Welter had asked his neighbor to

8   perform on his behalf; that is, watering plants, emptying

9   garbage, setting up phone accounts are all what would fall,

10  at least in my opinion, in kind of a normal maintenance or

11  routine maintenance type category.  The destruction of the

12  hard drives, it seems to me, falls into a very different

13  category.  My conclusion as to that conduct I find is

14  further supported by the concern the neighbor obviously had

15  in bringing the hard drives to the attention of the FBI.

16          Here, although the hard drives did not demonstrate

17  or show any additional evidence related to the original

18  investigation that had been undertaken, they ultimately did

19  show the presence of child pornography which ultimately led

20  to the second offense of conviction in this case.

21          Alternatively, I find that the obstruction of

22  justice enhancement is properly applied in this case based

23  upon Mr. Welter's testimony as given at the hearing in which

24  he sought to withdraw his guilty plea, that is, after

25  appearing in this court and representing to this Court under

US v. Welter - Sentence - May 30, 2013

1   oath that he was, in fact, guilty of an offense which had as

2   an element the knowing possession of child pornography.

3   Mr. Welter later appeared and testified in this Court that

4   he was -- or at least he did not believe that he was guilty

5   of that offense based on the evidence that he had seen in

6   the case after the entry of his plea.

7           I find in several respects Mr. Welter's testimony

8   as contradicted by the evidence, that is, his original

9   statements as well as Mr. Chamberlin's testimony with

10  respect to the information he had provided Mr. Welter and

11  the statements that Mr. Welter had made to him in relation

12  to the child pornography offense, and therefore find

13  alternatively that the obstruction of justice enhancement is

14  properly applied in this case.

15          I think in some respects, particularly with

16  respect to the original count, that is, possession of a

17  firearm by a convicted felon, Mr. Welter's candid statements

18  with the Court and his entry of a guilty plea might

19  otherwise support an application of the acceptance of

20  responsibility adjustment.  However, in looking at the

21  totality of the circumstances, that is, Mr. Welter's conduct

22  with respect to both offenses in this case, I find that the

23  acceptance of responsibility, Section 3E1.1, should not be

24  applied.

25          However, I do find that as a result of that at

US v. Welter - Sentence - May 30, 2013

1  least Mr. Welter's partial acceptance in relation to the

2  922(g) offense has not been fully accounted for, and I will

3  consider that factor in terms of a variance or a possible

4  variance in this particular case.

5          Does that resolve the pending objections at this

6  point?

7          MS. COSTNER:  Yes, Your Honor.

8          THE COURT:  All right.  Then, Mr. Welter, I'll ask

9  you at this point in time, have you reviewed the presentence

10  report with Ms. Costner?

11          THE DEFENDANT:  Yes, sir, I have.

12          THE COURT:  And other than the factors that

13  Ms. Costner has brought to my attention, are there any

14  additional objections?

15          THE DEFENDANT:  Could you repeat that, sir?

16          THE COURT:  That was a bad question.

17          THE DEFENDANT:  Well, I have to read your lips as

18  well to hear what you're saying.

19          THE COURT:  Are there any other objections other

20  than what Ms. Costner has brought to my attention?

21          THE DEFENDANT:  No, there -- no, Your Honor.

22          THE COURT:  All right.  You may have a seat.  Then

23  I will overrule the objections.  I adopt the presentence

24  investigation report without change.  In Mr. Welter's case,

25  the resulting -- neither offense of conviction carries a

1  mandatory minimum sentence.  The resulting advisory

2  guideline calculation is as follows:

3          A total offense level of 30.

4          A criminal history category of three.

5          A guideline imprisonment range of 121 to 151

6  months.  Yes, sir?

7          MR. GREEN:  I think his criminal history category

8  history is two given the --

9          THE COURT:  Oh, that's right, I forgot.  I'm

10  sorry, Ms. Meyers, let me come back to you.  With a thirty

11  and a two, where does that leave us?

12          MS. MEYERS:  Your Honor, with a thirty and a two,

13  that's 108 to 135.  The fine range does not change.

14          THE COURT:  All right.

15          A supervised release range of one to three years

16  as to the 12C123 case and five years to life as to the

17  12CR399 case.

18          The fine range does not change.  It remains at

19  15,000 to $150,000.

20          And a special assessment of $100 as to each count

21  is mandatory.

22          Give me just a second, Ms. Costner.  All right.

23  Ms. Costner, will there be any additional evidence on behalf

24  of Mr. Welter?

25          MS. COSTNER:  No, Your Honor, no evidence.

1            THE COURT:  All right.  Then I'll hear from you at

2    this time as to what constitutes a sentence that is

3    sufficient but not greater than necessary taking into

4    consideration the advisory guideline calculation as well as

5    all other factors set forth under 18 USC Section 3553.

6            MS. COSTNER:  Thank you, Your Honor.  Your Honor,

7    I know the Court has reviewed the presentence report and

8    Mr. Chamberlin's memorandum, and I just want to add a few

9    things to that for the Court to consider.

10            Your Honor, in looking at, first of all, the

11    history and characteristics of Mr. Welter, I know the Court

12    is aware of his criminal history and that it's not

13    insignificant in terms of the actions that caused him to

14    serve a prison sentence about -- of about 25 years, although

15    he did not serve all of that.

16            Prior to that time, though, Your Honor, he had

17    served in the military.  He had served in the Marines.  He

18    had had some injuries.  In talking to Mr. Welter, he feels

19    like even during that period of time, he may have been

20    suffering from some post traumatic stress syndrome and some

21    other mental health issues.  Your Honor, I think that is

22    supported by what you see in the presentence report and in

23    the psychological evaluation.

24            Mr. Welter had a very difficult childhood.  He had

25    parents who were not very engaged in child-rearing and, in

US v. Welter - Sentence - May 30, 2013

1   fact, were abusive.  His sister verified that.  I think the

2   fact that there is no family here today is very telling of

3   that family history.  He's not close to his brothers or

4   sisters.  They all apparently have disclosed a pretty

5   traumatic upbringing, and it sounds like Mr. Welter really

6   felt the brunt of that and that has followed him throughout

7   his life and has caused some of the mental health issues

8   that I think are before the Court -- or that, you know, in

9   him as he sits before the Court.

10          Having said that, though, Your Honor, there are

11  some good things about Mr. Welter, and one of those is his

12  work history.  For somebody that had the type of prior

13  convictions, criminal history that he has, he has -- I think

14  he described himself as God's gift to the mechanical world,

15  and I think that's supported in his work history.  Your

16  Honor, he's worked at various auto mechanic shops and tire

17  shops.  He's earned a good income.  He's apparently been an

18  excellent employee, and he's been a hard worker.  He had a

19  home -- has a home that he's in danger of losing at this

20  point, but it was a home that he was living in at the time

21  of his arrest.

22          Really, since his discharge from prison, he --

23  other than one, I think, prior charge that was dismissed, he

24  really hadn't -- there was no other problems with the law.

25  He -- in fact, from talking to him, and I think this is

1    borne out in the investigation materials in the presentence

2    report, prior -- right -- the firearm that was found in the

3    home was taken from a neighbor who had threatened to kill

4    herself.  He tells me he kept it in an outbuilding.

5           But then he had a total knee replacement just a

6    few weeks before his arrest.  He was engaged in some

7    internet websites involving Muslims.  He is Muslim, and he's

8    freely admitted that.  He had received some threats from

9    some other folks and was scared, found himself in a pretty

10   disabled position because he had his knee surgery, and they

11   released him home, no family, no one really to care for him.

12   He did have neighbors sort of checking on him, but, you

13   know, a knee replacement is a pretty debilitating type of

14   surgery, and it renders one pretty helpless.

15           THE COURT:  Now, I understand the point on taking

16   the gun from the neighbor who is concerned about whether she

17   will use the gun to kill her self, but isn't that story

18   undermined by the presence of other types of ammunition in

19   the house, .410 and 92 rounds of assorted ammunition?

20           MS. COSTNER:  There's no other weapon in the

21   house, Your Honor; and, you know, certainly at the time that

22   he was charged with this, the only weapon was the one that

23   was seized --

24           THE COURT:  I understand that, but doesn't the

25   presence of various types of ammunition plus an express

US v. Welter - Sentence - May 30, 2013

1   interest, regardless of who instigated it, in purchasing

2   other firearms suggest this is not a one-time, isolated

3   instance?

4           MS. COSTNER:  May I have a moment?

5           THE COURT:  You may.

6           (Discussion between counsel and defendant.)

7           MS. COSTNER:  And I'm sorry, Your Honor, that's

8   not a point I ever talked to Mr. Welter about.  What he

9   tells me is that all came from the neighbor.  She gave him a

10  bag that had the firearm and all her ammunition, and that's

11  what she had in the house.

12          Now, did he engage in conversation with this agent

13  or undercover person about firearms?  Yes, he did.  And I

14  did talk to him about that, and basically what he tells me

15  is that was just a conversation about guns, ammunition.  It

16  wasn't, you know, any plot or any disclosure on his part of

17  some desire to have a cache of guns or to, you know, start

18  some kind of terrorism or some kind of problem.  He was just

19  talking to another person about firearms and guns and was

20  not intending that to be some conversation to reflect some

21  desire on his part to accumulate a stash of them.

22          And he didn't have a stash of them, he had this

23  weapon, and he had it nearby after his surgery because he

24  was scared and wanted just to have something to defend

25  himself with it.  Was that a good decision?  You know,

US v. Welter - Sentence - May 30, 2013

1    obviously not.  You know --

2             THE COURT:  I can't figure Mr. Welter out.  I

3    mean, Mr. Welter in some respects is kind of just like an

4    individual who likes to stir the pot and create trouble.  I

5    mean, that -- just do these little things to irritate and

6    get under the skin of other people.

7             On the other hand, Mr. Welter, it seems to me,

8    never is forthcoming about what he's done.  He tries to

9    downplay attempting to blow up a law enforcement officer as

10   being kind of first cousin to a prank but an offense for

11   which he received a sentence of 25 years and served 9.

12            He then, while he is in custody on that offense,

13   rewires a vehicle to shock the individual who attempts to

14   start the vehicle; and when a guard attempts to start the

15   vehicle and is shocked, he's sanctioned for that, and he

16   attempts to downplay that by, well, we were just playing

17   pranks on each other, and I didn't know the guard would get

18   in the car.

19            He then changes his religion to Islam, travels to

20   Lebanon; and when the FBI shows up, he starts showing them

21   how adept he is with this .22 pistol that he's got,

22   describes to them how he would like to purchase other

23   firearms, and then comes into court and says I was just

24   holding all this as a good deed for my neighbor who had

25   threatened to commit suicide.

US v. Welter - Sentence - May 30, 2013

1          I asked my neighbor to destroy hard drives during

2   the course of an FBI investigation, but that was just

3   routine maintenance, and I didn't mean anything by that.

4          So maybe it is true that some of things Mr. Welter

5   does are not the most serious, but Mr. Welter's pattern of

6   conduct of trying to excuse and minimize that conduct is

7   really what troubles me about him.  Standing alone, the

8   922(g) offense was a 10- to 16-month.  Standing alone, the

9   possession of child pornography is not nearly the most

10  serious of the possession of child pornography offenses, and

11  I can assure you I -- and I will do it today -- I think the

12  computer overstates the seriousness of the offense, and some

13  of these adjustments, in my opinion, need to be reduced.

14         But every time something comes up, Mr. Welter's

15  got an answer that most of the time really doesn't make --

16  ring true, I guess, is the better way to put it.  So he

17  manages to escalate, in my mind, what he's done with what he

18  does after he does it.

19         MS. COSTNER:  Certainly, he makes some very poor

20  choices, and that's probably an understatement in many ways.

21         But, Your Honor, I know, has reviewed his

22  psychological evaluation, and I think some of the

23  minimization is part of his psychological profile.  And I

24  would either venture to say that when one has been the

25  victim of physical and emotional abuse in your home as a

child growing up, that tends to make one minimize, and I'm

just saying that from experience of dealing with people in

that situation.  It's hard to accept responsibility, I

think, when as a young child you've been beaten and

terrorized and abused by your own parents.

          And so I would contend that his history and his --

the psychological testing support some of that -- or what

the Court is saying in terms of your evaluation of his

behavior, but I'm not convinced that it's willful in all

respects, and I think that's based on his history and the

testing, Your Honor.

          And, you know, it is a series of poor choices, but

I would say that this is also a man who can function.  He is

a loner.  He lives alone.  Clearly, he has no family.  Here,

but he's worked --

          THE COURT:  He's got some skills.

          MS. COSTNER:  He's got great skills.

          THE COURT:  He's obviously very bright.

          MS. COSTNER:  Great job history.  He's got a high

IQ.  His IQ testing was high.  You know, he described to me,

and I saw this in the discovery, times when working at Pep

Boys -- he observed somebody driving under the influence and

he called, and they were arrested.  So he apparently

reported the Muslim -- or the Islamic person who was

threatening him, and he was afraid of that person and made a

US v. Welter - Sentence - May 30, 2013

1  report about it.  So he has been proactive in those aspects,

2  but then he sort of in some ways walks this line that the

3  Court described.

4          But where that puts him -- and, you know, that's

5  the nature and characteristics of Mr. Welter.  There's good

6  and there's bad as there are in most people.  There just

7  maybe seems to be more extremes.

8          But I think that, you know, what the discovery and

9  the investigation did bear out is that, you know, while this

10 man did have this weapon in his home, and while on this

11 computer there was this very old child pornography -- and,

12 you know, I haven't gotten to the -- you know, just talking

13 about actually the offenses themselves.  I've discussed the

14 weapons charge with the Court, but this child pornography

15 was on a hard drive not attached to a computer.

16         Looking at, at least, you know, the analysis, and

17 I'm not a computer expert, but I do have this -- you know,

18 all of it -- the images, it looked like, were in temporary

19 internet files.  Then you have this video that was in this

20 AVI file in a different place, not in a temporary file.  But

21 it looked to me like some of it may have been accessed maybe

22 in 2009.  That may be when he downloaded the hard drive on

23 to that hard drive with a new computer.  Maybe it was

24 accessed in 2007, maybe 2002, but it was very old.

25         And even, you know, from the agent that testified,

1   he could only find that the video in his analysis had been

2   looked at one time.  That's all he saw support for.  And I'm

3   not saying that he testified it had only been looked at

4   once, but he couldn't find any -- or accessed, I guess.  The

5   accessing and looking at it may be two different things.

6   You could see it and turn it off and not delete it.

7        But this is a case where this man had on this hard

8   drive where -- was it 140 images, and 75 of them were

9   attributed to one video.  So certainly very few images.

10  Very little access, if at all.  Very old and in temporary

11  files.  Those images were not loaded into My Pictures or

12  some kind of file like that.  They were temporary internet

13  files that somebody had to go and actually find on a hard

14  drive.  They weren't saved in a little folder or anything

15  like that where you, you know, you might keep your pictures

16  that you want to look at all the time.

17       There was no file sharing software.  No evidence

18  that these photos were traded or, you know -- if anything,

19  they may have been -- you know, they were downloaded off of

20  Internet Explorer and in a temporary file, and so I think

21  that takes it sort of out of the realm of maybe what we

22  normally see in these kinds of cases where, you know, people

23  do keep these images or they're sharing them or there's file

24  sharing software.

25       THE COURT:  One of my concerns, and I don't think

US v. Welter - Sentence - May 30, 2013

1   it's a necessarily a fair consideration, though, is that

2   Mr. Welter -- he had two hard drives standing -- apparently

3   standing alone in his house.  Now, I don't know,

4   Ms. Costner, what you do with your computers, but usually I

5   have to rely on some kind of expert to come in and wipe a

6   hard drive, and I just get rid of the computers.

7          There's a level of sophistication here that gives

8   me some concern like in the gun case where we've got

9   evidence of possession of gun and multiple types of

10  ammunition and suggestions about interest in buying guns

11  after the offense is committed that there's more here than

12  meets the eye, so to speak.  You may disagree.  I'm kind of

13  asking the question, but --

14          MS. COSTNER:  Well, I would disagree with that

15  because I met with these -- the FBI agents that analyzed the

16  hard drives and the external hard drives and the computers,

17  and, I mean, it seems to me that they -- I mean, they could

18  find no evidence, and, you know, my under -- I'm no expert

19  in computers.  I have some working knowledge, but I'm not,

20  you know, by any means con -- would consider myself an

21  expert, but I do enough to know that to -- I remember going

22  to a seminar with Tom Cochran who basically spoke and said

23  you have to shoot one six times to really get rid of all the

24  images and everything on a hard drive.  I mean, it stays

25  resident.  So I think if they couldn't find anything on

1   those hard drives other than what is before the Court, it

2   just wasn't there.

3          THE COURT:  I have to say -- I'll hear from

4   Mr. Green, but I think that's a relatively fair point.  I

5   mean, Mr. Welter's done some rather -- clever may not be

6   quite the right word in terms of hiding his conduct, but I

7   think it would be unfair to Mr. Welter to speculate about

8   what else might be out there in light of your argument.

9          MS. COSTNER:  I do.  I think that they analyzed

10  it, I'm sure, very, very thoroughly, and I have no doubt

11  that, you know -- given the fact that, you know, when he was

12  arrested -- I looked at the archived, you know, video from

13  the news organizations.  They thought apparently that they

14  had some terrorist who, you know, was plotting to overthrow

15  the Government almost, and certainly none of that was on the

16  hard drive either, and I'm sure they had every incentive to

17  comb through those computers with the finest of fine tooth

18  combs at that point.

19         Having said that, Your Honor, that sort of

20  transitions me into talking about the seriousness of the

21  offense and the punishment and that sort of -- that part of

22  3553, and Mr. Welter did want me to let the Court know that

23  those news interviews have been very detrimental to him.

24  He's been punished in some ways.  And I'm not saying that

25  the Court should substitute this for any punishment, but

1    just to let the Court know.

2            Mr. Welter lost almost every friend he had had

3    based on those interviews.  He -- you know, people distanced

4    themselves from him.  He feels that even when he serves

5    whatever sentence the Court gives out, anybody that Googles

6    him or goes online to search and sees those interviews may

7    believe that he, in fact, is a terrorist, and he may never

8    get employment again, and he has suffered from that and

9    feels terrible about it, and it is of great concern to him.

10           Your Honor, the guideline range for Mr. Welter is

11   very high, and I know that part of the five-point swing is

12   the obstruction and acceptance of responsibility.  But even

13   without that, we're talking about a very large sentence for

14   what I would contend -- and I'm really talking more about

15   the child pornography charges because I know what the

16   guidelines are with the gun charge -- for images that are

17   old, three years at the minimum, probably older than that

18   based on what I see; images that are in temporary files, not

19   accessed; images that were not part of file sharing

20   software; images on a hard drive not even hooked up to a

21   computer; and no evidence that on any of the computers that

22   he was currently using that these -- that he had any type of

23   this type of material on that computer.  So I would ask the

24   Court to take all of that into consideration in fashioning a

25   sentence.

1          And, you know, Mr. Chamberlin did set out sort of
2  a proposed range of 41 to 51 months in his position paper.
3  I would contend to the Court that that in light of all the
4  3553 factors is a reasonable sentence, and I would ask the
5  Court to consider a sentence at that range.
6          And let me just make sure.  Oh, and just to let
7  you know a couple other things about Mr. Welter that I
8  wanted to point out.  He is -- he does have some medical
9  considerations.  He's had this total knee replacement.  He's
10 having some issues with that.  He came here today on a cane.
11 He does suffer from migraines and some other health, spine,
12 head injuries.
13         In sentencing him, Your Honor, we would ask the
14 Court to, first of all, recommend a designation to a place
15 for mental health treatment.  I think Mr. Welter would like
16 to get some assistance with some of the post traumatic
17 stress and the other issues that may have been raised in the
18 psychological evaluation.
19         I would also point out in -- and I meant to say
20 this in the psychosexual evaluation, Dr. Hirsch in
21 evaluating Mr. Welter found that he is, I believe, a low
22 risk -- oh, he may have been low to moderate.
23         THE COURT:  Low moderate, I think.
24         MS. COSTNER:  No evidence -- but I would contend
25 that's more based on the materials than, you know, the

1  testing with Mr. Welter.  No evidence that Mr. Welter is

2  attracted to children, is a danger to children, is someone

3  that is aroused by these types of images.  You know, as I

4  said, a high IQ and some other psychological issues, but no

5  evidence that Mr. Welter has some type of pedophilic sort

6  of, you know, inclinations at all.  But Mr. Welter would be

7  interested in psychological assistance just to deal with

8  some of the issues that have followed him throughout his

9  life from his childhood.

10         Also if the Court could recommend a medical

11  facility to help him further with the knee issue, and he

12  does have some back and head problems and would be very

13  interested in any medical care that he could avail himself

14  while in the Bureau of Prisons.

15         THE COURT:  All right.

16         MS. COSTNER:  Thank you.

17         THE COURT:  Mr. Green?

18         MR. GREEN:  Well, Your Honor, I guess we've got,

19  you know, two issues, two offenses.  One is the firearm

20  offense.  I think that necessarily implies looking at what

21  kind of felon was he?  You know, we've kind of stripped away

22  with *Simmons* and a bunch of other stuff.  I guess we got rid

23  of a bunch of nonserious felonies, you know, or at least

24  that's one way of looking at it.

25         But what he was convicted of was extremely

1  serious.  He attempted to murder a law enforcement officer.

2  I know the Court talked some about his -- you know, kind of

3  his approach to it, that it was a prank.  In one sense he

4  does seem to be talking out of that side of his mouth.

5       But when he gets in with Dr. Hirsch in the

6  psychosexual evaluation and they discuss the criminal

7  history, it's ten times worse than that.  He blames the

8  trooper, right?  The trooper was harassing him.  The trooper

9  had caused his divorce -- his wife to come home and want a

10  divorce because she had been stopped outside.  He says,

11  alternatively, that he lashed out at the trooper -- this is

12  on page 5 at the bottom.  He admits that his intention was

13  to kill him, to murder a North Carolina State Highway

14  patrolman.  And then kind of the penultimate line, page 6 at

15  the top of that page, in the doctor's opinion he seemed

16  ambivalent when asked if he felt bad about what the officer

17  experienced.  That is, of course, getting in your car and

18  having pipe bombs go off and nearly kill you, and his answer

19  was that the officer got a serious wake-up call.

20       Now, we talk about history and characteristics of

21  people, but, I mean, you have an individual who uses a

22  sophisticated, premeditated planned way of killing someone,

23  and his opinion is, well, he got a wake-up call, and that

24  doesn't seem to have been -- that kind of approach to life

25  doesn't seem to have been assuaged by any life experience or

1    whatever because we get in the situation, and it's well, you

2    know, I had the gun, but that was really to protect my

3    neighbor, but I had it for seven years.  I had it readily

4    available when the person comes to the door and could show

5    them and demonstrate.  I have other ammunition of different

6    types in the house, but that's really -- it really

7    doesn't -- you know, that relates more to my neighbor and

8    her problem.  That's his approach.  Oh, I want to discuss

9    about this other gun that I may purchase, but really this is

10   more about my neighbor.

11          He obstructs justice, as the Court has so found,

12   both as to the ongoing investigation and the seriousness of

13   that ongoing investigation, and he attempts to -- really,

14   it's worse because he attempts to elicit someone unknowingly

15   in his plot to get rid of evidence that he knows is wrong.

16   He says -- we have a whole series where I didn't plead

17   guilty.  I don't know anything about this stuff.  Judge, you

18   really ought not to consider me and -- because I really

19   didn't know about that stuff; and were I to go to trial,

20   that would be an argument, even though he admitted that he

21   did, in fact, know it before Judge Schroeder and essentially

22   admitted it before you again.

23          When we look at his psychological history as it

24   relates to the child pornography, he's adjudged a low to

25   moderate risk based on what?  Self-reporting about what his

US v. Welter - Sentence - May 30, 2013

1  own attraction to children when he denies that he did that

2  now, and he denies it to Dr. Hirsch.  That's kind of --

3  that's kind of -- that's not a surprise result one would

4  think.  Hey, he denies the typical history and

5  characteristics associated with pedophiles --

6         THE COURT:  What would you point to as evidence

7  that he constitutes a higher risk than that based on what's

8  present in this case in terms of pedophilia?

9         MR. GREEN:  Well, I think he's a high risk to be

10  an offender, period, a violent offender.  I consider --

11         THE COURT:  But my question relates to pedophilia

12  because you disagree with Dr. -- or you express concern

13  about Dr. Hirsch's opinion --

14         MR. GREEN:  Yes, sir.

15         THE COURT:  -- of a low to moderate risk in that

16  category.

17         MR. GREEN:  To the extent that that opinion is

18  based on Mr. -- Defendant Welter's self-reporting about

19  anything at all, then, yes --

20         THE COURT:  It's based on self-reporting, testing,

21  and Dr. Hirsch's opinion on that constellation of factors.

22         MR. GREEN:  I understand that.  The testing itself

23  is self-reporting.  I mean, I don't want to belittle

24  Dr. Hirsch or belittle psychology or psychiatry in general,

25  but we don't have a test yet that's objective that says we

US v. Welter - Sentence - May 30, 2013

1   can hook you up, and that's going to tell us you're going to

2   be a pedophile in the future.

3           THE COURT:  You are challenging his findings.

4           MR. GREEN:  I am.

5           THE COURT:  All right.  So what evidence is there

6   in this case that would suggest he is a higher than low to

7   moderate risk in terms of pedophilia?

8           MR. GREEN:  Well, I think you're misunderstanding

9   my point.  If we have an assessment based on certain

10  factors, which include his self-reporting, in which during

11  that self-reporting he, in fact, denies committing the

12  offense in question --

13          THE COURT:  Which is something Dr. Hirsch knew

14  too, didn't he?

15          MR. GREEN:  He did, no question.  But I think you

16  can certainly look at that in a little more skeptical eye as

17  opposed to a defendant who came in and said yes, because of

18  some prior abuse, I've had a fleeting interest in child

19  pornography, and that is the circumstances of what happened

20  here.

21          THE COURT:  So disregard that testing entirely?

22  Where does that leave you?

23          MR. GREEN:  Well, I don't know if you disregard it

24  entirely, but, again, my understanding of these

25  circumstances as it's described in the thing is the testing

US v. Welter - Sentence - May 30, 2013

1    is comprised in many respects of self-reporting of a

2    constellation of symptoms or I like children, I don't like

3    children.  We look at prior events in his past.  Did he

4    abuse, you know, animals and so forth.

5            So as part of that criteria, that is, I am going

6    to honestly give you information about the way I feel about

7    things, he's denied it.  I mean, denied it completely.  And

8    Dr. Hirsch himself says, hey, look, in the future, on

9    page -- well, in the PSR notes, hey, part of his criteria

10   for being successful and this -- because he's a low to

11   moderate risk, and what I'm suggesting is appropriate, he's

12   got to admit his conduct.  That's noted on in the PSR as

13   well.

14           I mean, where are we going to -- what's our hope

15   there that he's denied it at every turn now?  What's our

16   hope that this gentleman is going to say you know what?  I

17   do have a problem as it relates to child pornography.  If we

18   look at the circumstances in which -- and I understand

19   Ms. Costner's example, and maybe part of this is just I kind

20   of in one respect look at this maybe like somebody -- a

21   member of the public would.  I don't do these cases all the

22   time.  You know, the Court, I know, has many, many, many

23   more child pornography cases, and I know just by anecdotal

24   evidence that there's probably people who have thousands of

25   images.

```
 1            THE COURT:  There are, which is the reason I asked
 2   my question.  I mean, even if I kick out Dr. Hirsch's report
 3   and say it's unreliable because Mr. Welter doesn't tell the
 4   truth, we're talking about 145 images here that at least on
 5   the evidence before the Court I don't know that anything was
 6   downloaded or looked at prior to -- after 2009, and I'm not
 7   sure about the time frame.  So I'm not sure what the basic
 8   evidence is in the case to suggest that Mr. Welter is a high
 9   risk or something more than low to moderate, at least by
10   comparison to other cases.
11            MR. GREEN:  Well, I guess it's higher risk of
12   what?  That's one question.
13            THE COURT:  I understand that.  But you are the
14   one that started talking about pedophilia, and that's the
15   part -- I understand the risk of future criminal conduct.
16            MR. GREEN:  Yes, sir.
17            THE COURT:  But it was your point related to
18   pedophilia, and that's the one I don't understand because
19   even without Dr. Hirsch's opinion, without Mr. Welter's
20   statements, take all that out, assume he's not telling the
21   truth, it's not the most egregious of these offenses that I
22   have seen, which is where I'm struggling to say he's a high
23   risk on that particular offense.
24            MR. GREEN:  I understand.  I don't -- and I
25   think -- I don't want to misstate -- what I'm saying here is
```

US v. Welter - Sentence - May 30, 2013

1    I don't come into court and say I can predict the future.  I
2    quite honestly believe as relates to his danger to children
3    to sexually abuse them -- I don't know.  I don't think
4    Dr. Hirsch is particularly helpful with -- his assessment
5    particularly aids the circumstances when you have a
6    defendant in this case who is denying the very conduct which
7    he is self-reporting on.
8              So, yeah, I think we should take it off, and the
9    point I was trying to make is, again, not being as
10   experienced as the Court, I mean, I don't know how many
11   pictures of an 8-year-old or a 7-year-old or a 12-year-old
12   engaged in some sexual act where an adult male ejaculates
13   into her mouth, I mean, how many do we have to have?  I
14   certainly understand that there's some people who come into
15   court with 35,000 of them.
16             THE COURT:  I mean -- exactly.
17             MR. GREEN:  Right.
18             THE COURT:  There's -- so the point is sometimes
19   the only yardstick I have is by comparison to other cases,
20   and this one in terms of that particular conduct is not even
21   close to a number of cases, and I don't know what to
22   conclude from that.  I understand your point about
23   Dr. Hirsch, but he's got some expertise.  I've seen his
24   reports before.  Low to moderate is pretty common on a
25   simple possession only offense, almost regardless of what

1   the defendant says.

2           I don't see any evidence here of an approach of a

3   live human being, of any unusual associated conduct, and so

4   I'm not sure how to find anything other than a low to

5   moderate risk, frankly.

6           MR. GREEN:  Of pedophilia.

7           THE COURT:  Um-hum.

8           MR. GREEN:  But not necessarily law breaking.

9           THE COURT:  No, the other conduct is a different

10  story.

11          MR. GREEN:  Right.  And I guess also, Your Honor,

12  I can't predict if he's going to get on a computer again.

13  Obviously, part of your judgment is going to be that he does

14  not.  But I think sometimes -- again, I am removed from

15  doing these cases everyday, but the offense itself is the

16  offense itself.  I mean, you have victim impact statements

17  as part of the PSR.  I mean, being re-victimized every time

18  someone is in their trailer in Concord and views again your

19  father sexually abusing you, I think sometimes we all lose

20  sense of that, that these continual downloading creates a

21  market for these individuals.  Why does that stuff continue

22  to appear on the internet?  Because there's an appetite for

23  it, and therefore it creates basically an incentive for

24  people to abuse children.

25          So, again, I don't do these cases all the time, so

1    maybe my -- "outrage" is not the right word, just extreme

2    discomfort with the topic.

3              THE COURT:  I mean, if you're not outraged by the

4    material, then you're not human.

5              MR. GREEN:  Right.

6              THE COURT:  That's part of the problem.  But I

7    have some other responsibilities both with respect to the

8    victims and the general public as far as Mr. Welter's future

9    conduct.

10             MR. GREEN:  Fair enough.

11             I think his future conduct -- again, we have an

12   individual convicted of in the past extremely serious crime.

13   He minimizes it.  He blames others.  He again violates the

14   law by possessing a firearm, which is, I think, more serious

15   in his case because of the nature of his prior conduct.  He

16   minimizes it.  Says it's someone else's fault.  It's because

17   my knee was hurt.  Then he engages in obstructive conduct

18   and denies any responsibility for the more serious of the

19   offenses.

20             In toto, Your Honor, I think looking at the 3553

21   factors, a guideline sentence is appropriate.

22   Mr. Chamberlin when he made that prediction was assuming

23   that none of the enhancements were going to apply, and I

24   think a guideline sentence is appropriate given this

25   particular defendant and his nature and characteristics.

1           THE COURT:  All right.  I am going to hear from
2   Mr. Welter, and then we're going to take a short break, and
3   I'll come back and give you my ruling in the case.
4           And while we're on break, Mr. Green,
5   Mr. Ramaswamy, I mentioned this earlier, and Mr. Ramaswamy
6   is familiar with it.  I do, in today's technological age,
7   have concerns about plus two on the computer because that's
8   about all we see in 100 percent of the offenses.  Here, the
9   number of images is not significant.  The types of images
10  given the history of some of this viewing of child
11  pornography materials, while alarming, in isolation in terms
12  of comparison to other defendants, I think it's very serious
13  in this case.  The plus four sometimes causes me some
14  issues.  So Mr. Ramaswamy can give you some background if
15  you want to be heard further on that.  When I come back,
16  I'll be happy to hear from you briefly.
17          Mr. Welter, you're not required to say anything.
18  If you choose to remain silent, your silence will not be
19  held against you in any way whatsoever, but you do have the
20  right to address the Court before any sentence is imposed;
21  and if you wish to address the Court, now is the appropriate
22  time.
23          THE DEFENDANT:  Thank you very much, Your Honor.
24          First off, Your Honor, I find I must address my
25  crime from 1986 first because this is the basis for

Case 1:12-cr-00399-WO   Document 36   Filed 09/30/13   Page 51 of 74

1  everything that has happened from that point on in my life.

2          THE COURT:  Must address your first?

3          THE DEFENDANT:  My crime in 1986.

4          THE COURT:  Oh, the crime in 1986.

5          THE DEFENDANT:  Yes, sir, must address it.  There

6  is the opinion I'm given that I think this is a flippant,

7  flyby -- you know, just this little joke, and I don't take

8  it as a joke.  Every time I try to have a relationship with

9  someone, I have to tell them of this crime.  Every time I

10 apply for a job, I have to tell them about this crime.

11 Everything that goes on in my life, I have to tell them

12 about that.  It affects my life in ways today that I cannot

13 communicate.  It is an extreme load on me, and I have

14 extreme guilt about it, so I don't tell people about it.  I

15 am very ashamed of it, and I cannot reiterate that enough to

16 this Court.

17       At the time for whatever reasons I've justified it

18 to myself, I felt I was justified.  I was wrong.  I have

19 admitted that, I have lived with that, I have dealt with

20 that, and I do not want this Court or the prosecutor to make

21 light of my own personal feelings about this.  I have to --

22         THE COURT:  Nobody's making light of your

23 feelings, Mr. Welter, but did you go in and tell Dr. Hirsch

24 there wasn't that much to it.

25         THE DEFENDANT:  Yes, Your Honor, I did, and it is

1  a tendency when you do these things to try to blow them off,

2  to minimize them, because to communicate that I tried to do

3  something to someone for the reasons I did it, it doesn't

4  wash with me, okay.  I'm lying to myself if I try to say I

5  was legitimate.  I wasn't legitimate, and I know that.

6        So when people say, well, what about this, you try

7  to blow it off because you say -- you just don't like facing

8  it, and I have to face it constantly.  Some people, you

9  know, in prison pat you on the back and say you're a hero.

10 I am not a hero.  I don't want anybody ever saying that

11 about me.  I mean, I tell them that.  I am not proud of

12 that.  People try to say -- oh, they come up and ask about

13 explosives, they ask about how you do this, that, and I say,

14 dude, I don't even want to get into that because that is a

15 no-win proposition.

16        THE COURT:  I understand your point on that,

17 Mr. Welter.  Anything directly related to these offenses you

18 would like to say?

19        THE DEFENDANT:  Okay.  The proposition has been

20 made that for some reason -- or basically that the firearm I

21 had in my possession was because of certain factors, and I

22 just want to go over this very quickly.  My neighbor brought

23 the weapon to me.  I took it from her because I felt she

24 would commit suicide.  But I, the next day, took and put it

25 in her shed so she would possess it because I knew I should

US v. Welter - Sentence - May 30, 2013

1    not have the this weapon.  I did not want this weapon.  She

2    brought a bunch of ammunition and things like that.  I took

3    the entire thing and said here, take this back, put it in

4    your shed, this is your possession, I don't want it.  That

5    was like eight or nine years ago.  It stayed there.  I never

6    had any fascination with it at all.

7            The only reason I brought it into my house was

8    because I had already contacted law enforcement -- and this

9    may sound like a copout, but I had -- concerning threats --

10   international threats.  I had contacted the FBI and written

11   them a letter saying this man is threatening me, here is

12   what he has said, he's tried to hire a hit man, I think,

13   because that was in the text, and I feared from my life.  I

14   never heard back from the FBI.  That was in November of

15   2011.

16           When I had my knee operated on, I'm basically

17   debilitated.  I'm double and triple dosing Vicodin,

18   Percocet, whatever, for the pain, and I for whatever reason

19   felt my life was not safe.  There's an old saying "You dial

20   9-1-1, all it does is tell them where the body is."  I felt

21   I had to protect myself.  I got the gun.  I had it in my

22   house merely to protect myself.  That was the only thing I

23   wanted to do.

24           THE COURT:  So what was there about the undercover

25   FBI agent you felt you needed to protect yourself from?

1          THE DEFENDANT:  He had -- okay.  Here is a man who

2     comes on my rear deck.  He is obviously lying to me about

3     why he is there.  I don't know who this person is, but I get

4     a vibration from him he's lying to me about something.  He's

5     telling me he was moving to the area.  He had X amount of

6     dollars in exact amount.  He was looking to buy a trailer

7     that wasn't even for sale.  He's very clean cut.  He's very

8     educated, but he says he works in construction.  Nothing

9     about this agent jibed.  He was throwing out alarm bells.  I

10    almost called 9-1-1.

11         But instead, he starts -- he says "I noticed a

12    Marine Corps sticker on the back of your van.  Were you in

13    the Marines?"  I said "Yes, I was in the Marines."  He said

14    "Well, do you like to shoot?  I'm looking for a shooting

15    range," and the conversation went on to firearms.  I'm

16    thinking to myself this man is either 100 percent here, you

17    know, just talking about this, or he's trying to find out if

18    I'm armed and if I'll protect myself.  At that juncture I

19    figure I'll just show him I've got a gun, and that is the

20    problem.  I went and got the gun and said, "See, I've got a

21    gun, here's how it works," etc., etc.  Then he leaves and

22    says "I'll see you later.  Hopefully, I'll be your

23    neighbor."  I put the gun back in my home not knowing this

24    is an undercover agent.

25         But this wasn't the first time the FBI had been in

Case 1:12-cr-00399-WO   Document 36   Filed 09/30/13   Page 55 of 74

1    my home.  The first time the FBI came to my home was in

2    May of 2011 when they interviewed me about my trip to

3    Lebanon.

4              THE COURT:  All right.  Now, a lot of these facts

5    I'm aware of, Mr. Welter, so if there's a point here --

6              THE DEFENDANT:  There seemed to be some confusion

7    about when each of these things happened.  The FBI first

8    came to my home, and then the undercover agent came 10

9    months later.  It was two totally separate events.

10             This is why I was talking about he said he wanted

11   to talk about guns, target shooting, things like that.  When

12   I was in the Marine Corps, I was a very good shot, and I did

13   a lot of target shooting and a lot of stuff like that, and

14   I've always -- I would like to get back into it, but I can't

15   because I have a felony record; I can't own a firearm.  So

16   that was the reason why we were discussing this and one of

17   the reasons why I showed him the gun in the first place.

18             I was scared of him, although I wasn't going to

19   let him -- because I'm pretty macho, and I try to be pretty

20   stoic about these things.  Like I said, I almost called

21   9-1-1 on the guy.  He was that obviously not kosher, for

22   lack of a better word.  That's why I showed him the weapon.

23             I had no desire to hurt anybody.  I really didn't

24   want to have the gun in the house in the first place, but I

25   felt it was the only way to protect myself in view of the

incidents that had happened on the internet and people
communicating things to me such as pictures of my home
closeup on a website, on the internet, pictures of my
license plate numbers, my driver's license picture on the
internet on a website. How did it get there? Out of my
computer. How did they get into my computer? I've got a
great firewall. I have no idea.

This had been going on for about 10 months. The
level of suspicion and paranoia gets to be a little bit
unsettling sometimes with this. You add in the amount of
drugs -- and I don't like to make an excuse like that, but I
was double dosing the pain pills, I really was, because I
was in a lot of pain, and I had to move around by myself. I
had no choice.

I made a mistake. I should not have brought the
gun into my house. I know that. I have no excuses for
this. There are reasons I did things. At the time they
seemed legitimate. Hindsight's always 20/20. If I had my
choice, I would have asked a state trooper or a highway
patrol -- or a county sheriff to park in my front yard
rather than do that again. At the time -- people say, you
know, you're making excuses. I'm not making excuses. I
felt I had no other choice. Otherwise, I would have never
done it.

We move forward to when I'm arrested and this

1   obstruction.  The FBI interviewed me for five hours in
2   Charlotte and discussed a lot of things with me.
3           THE COURT:  Mr. Welter?
4           THE DEFENDANT:  Yes.
5           THE COURT:  This is not the time to testify about
6   things I've already ruled --
7           THE DEFENDANT:  I know, Your Honor.
8           THE COURT:  -- upon.
9           THE DEFENDANT:  Okay.
10          THE COURT:  So if you've got anything that I need
11  to consider in terms of your sentencing --
12          THE DEFENDANT:  Yes, Your Honor.  The FBI has had
13  three interviews with me.  At every interview, I have been
14  as forthcoming and as honest and informative as I possible
15  can.  I've held nothing back from them.  That's the first
16  thing.
17          The second thing is, as Ms. Costner -- as she put
18  forward, when I got out of prison in 1995, six days after I
19  got out of prison, I had a job.  Six weeks after I got out
20  of prison, I had my own apartment.  Six months later, I was
21  master certified before other certified technicians on top
22  of it in the automotive field.  And about eight years after
23  I was out, I owned my home, my cars, and everything else.  I
24  was driven to do this.  I took myself from $130 in my pocket
25  to success, and I did it by being very hard charging, very

focused on what I was doing, and staying out of trouble.

I don't use drugs. I never have. I don't drink. I don't stay around people who can get me in trouble. I try to avoid that like the plague, which is why I accepted -- or started getting into Islam -- into the religion of Islam. Curiosity led me to research it. I found out it reflected my theological beliefs, which is why I accepted it. But one of the things you do when you accept religion is you have to know everything that's going on about it. There's a lot of study, a lot of internet time, maybe even going to a country across the water to find out what the people are actually like and what the culture actually says and does, and this is why I went to Lebanon, not to --

THE COURT: You're not being sentenced here today for any religious beliefs --

THE DEFENDANT: I know. That is a precursor --

THE COURT: -- nor travel.

THE DEFENDANT: -- to what I'm going to say. My intention has never been to hurt anybody or to follow what people would call radical Islam. That's what I was getting to.

Concerning the child pornography, I pled -- as I have communicated before, when Mr. Chamberlin first told me about these things, I suspected there was possibly -- it could possibly have been there because of my activities

US v. Welter - Sentence - May 30, 2013

1  online and people bringing things in.  You tag it, link it

2  in a chat room, and you go someplace, and you don't know

3  what's there.  I thought there might have been a possible

4  link.  I never saw any of this material, not that I can

5  remember.

6           Be that as it may, it exists.  Whether I like it

7  or not, whether I want it or not -- and I don't want it.

8  The stuff is pure poison.  It destroys everything it

9  touches.  Whether that actually is there is the factor.  And

10 when I saw the original what they call discovery, they said

11 there was five files, only five, and Mr. Chamberlin said

12 this basically says you're guilty.  I said, yeah, if it's on

13 the computers, I'm guilty.  I don't remember it, I cannot

14 rectify it, but I'm guilty because of that.  That is the

15 reason why I pled guilty.

16          But when I thought about it, I knew that there had

17 to be something more, and I kept demanding evidence; and

18 when I saw the evidence, then I could say, at least with a

19 clear conscious to myself, that there were other

20 considerations as to how it got on there.  People want me to

21 say I went here, I went there, did this and did that, to get

22 this stuff on my computer.  The files say opposite and

23 different from that.  I say different from that.

24          It doesn't matter.  At this juncture, it just

25 doesn't matter anymore.  I take responsibility for what's on

US v. Welter - Sentence - May 30, 2013

     1   these hard drives because they were in my possession.  I'm

     2   supposed to know what's on them.

     3             THE COURT:  Did you knowingly possess child

     4   pornography?

     5             THE DEFENDANT:  Sir?

     6             THE COURT:  Did you knowingly possess child

     7   pornography?

     8             THE DEFENDANT:  I possessed the hard drives.  The

     9   child pornography was on it.

    10             THE COURT:  Did you knowingly possess child

    11   pornography, yes or no?

    12             THE DEFENDANT:  I never saw these images.  They're

    13   there --

    14             THE COURT:  Anything further, Mr. Welter?

    15             THE DEFENDANT:  They're there, and that's all I

    16   can say, Your Honor.  I have to be honest.  If I had seen

    17   them, I'd say, yeah, I saw them, and I didn't, and I just

    18   blew it off.  I never saw them.  And that's the file I

    19   showed to you.  I'm sorry I can't be more thorough than

    20   that.

    21             THE COURT:  Were you being honest --

    22             THE DEFENDANT:  Absolutely honest, Your Honor.

    23             THE COURT:  Listen to my question.  Were you being

    24   honest with Judge Schroeder at your Rule 11 guilty plea?

    25             THE DEFENDANT:  Given the level of information I

1   had --

2              THE COURT:  No, sir.  Were you being honest --

3              THE DEFENDANT:  Yes, sir, I was as honest as I

4   could be.

5              THE COURT:  All right.  Anything further?

6              THE DEFENDANT:  No, Your Honor.  Thank you very

7   much.

8              THE COURT:  We'll stand in recess for 10 minutes.

9              (At 11:05 a.m., break taken.)

10             (At 11:17 a.m., break concluded.)

11             THE COURT:   All right.  Mr. Green, did you want

12  to be heard any further on my comments about the computer

13  and the images?

14             MR. GREEN:  No, sir.

15             THE COURT:  All right.  Well, in Mr. Welter's

16  case, there are certainly some difficulties presented in

17  terms of determining a sentence that is sufficient but not

18  greater than necessary.  Obviously, there is one offense,

19  the 12CR123 offense, I think, if I've got my case numbers

20  correct, possession of a firearm by a convicted felon, that

21  is a relatively straightforward case for the most part.

22             As I noted earlier in my comments to Ms. Costner

23  during the -- we had the benefit of a full presentence

24  report having been prepared at that particular point in

25  time, and because of the operation of the guideline

1  calculation as well as the application of acceptance of

2  responsibility, Mr. Welter ended up at a Level 12 and,

3  roughly speaking, under the old guideline calculation, a 10-

4  to 16-month guideline range.  I think it would have been a

5  twelve and a three -- let's see, a ten and three -- 10 to 16

6  months.  With the removal of the point for -- the criminal

7  history point, that would have dropped Mr. Welter to, I

8  think, a ten and a two or an eight to fourteen months as the

9  guideline -- applicable guideline range in that case.

10          After hearing Mr. Welter's testimony as well as

11  his allocution to the Court and looking at his pattern of

12  conduct in terms of minimizing his own conduct, quite

13  frankly, I find it very difficult to believe any of what

14  Mr. Welter offers as mitigating circumstances in terms of

15  his possession of the firearm charge in this case and would

16  otherwise as to that offense, after hearing Mr. Welter and

17  his minimization, I would be inclined to impose a sentence

18  which would reflect essentially a slight variance as to that

19  offense, and that is an 18-month sentence as to the 12CR123

20  case.

21          I know I'm going about this a little differently

22  because the guideline range is 108 to 135 months, but in

23  terms of explaining the sentence that I am imposing here, I

24  think it's a little easier for me to look at these two

25  offenses and the 3553(a) factors in terms of the two

1    separate offenses, at least at the start.

2           The child pornography case presents a very

3    different circumstance; that is, Mr. Welter has continued

4    throughout the course of that case, at least following his

5    plea of guilty and disclosure of the presentence report,

6    offered varying statements to the Court in terms of his

7    conduct in that case.  After originally under oath admitting

8    the elements of the offense and in essence accepting

9    responsibility for the offense, Mr. Welter has offered a "I

10   don't really think I did that" and not at all persuasive

11   comments about things he does not recall about those hard

12   drives, all of which are significantly undermined both by

13   his original plea as well as his efforts to destroy -- have

14   the hard drives destroyed.

15          Quite frankly, if there wasn't anything

16   incriminating on the hard drives, why the urgency in having

17   a neighbor go over into the workroom and destroy the hard

18   drives?  I find from the evidence before the Court that

19   Mr. Welter did, in fact, know what was on those hard drives

20   when he sent that letter, at least it appears to this Court

21   that he did by the fact, A, it doesn't appear there was

22   anything else incriminating on those hard drives, and, B, he

23   sought to have those hard drives destroyed.

24          So in looking at the guideline calculation as is

25   set forth in the amended presentence report, the child

1   pornography offense after application of the obstruction of

2   justice and denial of acceptance of responsibility results

3   in a base offense level of thirty, a criminal history

4   category of two.  And, ultimately, the firearm offense

5   results in no upward adjustment.  So the thirty and a two,

6   at least as I read the presentence report, all flows from

7   the child pornography offense.

8          I do -- it is very common in these cases -- as a

9   matter of fact, it almost occurs all the time now for a plus

10  two to be -- occur for use of a computer.  I have, as I've

11  expressed many times, very mixed feelings about a computer.

12  It certainly in terms of interstate commerce has a

13  significant effect on state commerce and availability

14  through file sharing to these types of materials.  On the

15  other hand, it makes this material significantly easier to

16  access in this day and time, and I'm not convinced in every

17  case, including Mr. Welter's, that the two-level increase

18  corresponds to -- I guess what you would say the implied

19  increase in culpability in the commission of the offense.

20         So a thirty and a two, if I remove the two levels

21  for use of a computer, we'd end up at a twenty-eight and a

22  two, that is 87 to 108 months.  In this case it seems to me

23  that the number of images is not significantly alarming to

24  suggest further dangerousness to the public in terms of any

25  pedophilia or child victim or abuse offenses.  But on the

US v. Welter - Sentence - May 30, 2013

1    other hand, Mr. Welter's conduct of committing offenses and

2    then minimizing those offenses does cause the Court

3    significant concern.

4          So I am finding that a sentence of 70 months for

5    Count One -- or for 12CR399 is sufficient but not greater

6    than necessary looking at the guideline range as well as the

7    number of images.  I recognize that that -- the total

8    sentence I will impose, that is, a sentence of 88 months is

9    a 20-month variance from the low end of the guideline range.

10    But in terms of Mr. Welter's conduct in looking at the --

11    I'll explain it further in just a second, but looking at the

12    total conduct in these two separate offenses, I find that a

13    sentence -- that sentence, that is, 88 months, is sufficient

14    but not greater than necessary.

15          The two -- looking specifically at the 3553

16    factors as those factors relate to the two offenses of

17    conviction, both the possession of a firearm under the

18    circumstances of this case, that is, Mr. Welter's past

19    criminal history as well as his demonstration of the firearm

20    to the undercover officer, the presence of other ammunition,

21    and Mr. Welter's express interest in purchasing other

22    firearms make this, in the Court's mind, a very serious

23    offense.

24          As I have indicated, the child -- the seriousness

25    of the child pornography offense, even looking at it in

US v. Welter - Sentence - May 30, 2013

1    tandem with the commission of another offense, does not

2    strike the Court as the most serious of the child

3    pornography offenses, but I say that fully recognizing, as

4    Mr. Green has argued, that the materials themselves as well

5    as the continued damage to the victims of that crime, that

6    is, the individuals who are filmed in -- or photographed in

7    those child pornography cases just simply cannot be

8    overstated in terms of the seriousness of the offense.

9           Mr. Welter has a very unusual history.  He has a

10   substantial history of military service, even though it

11   ended in less than honorable circumstances; and in spite of

12   whatever disadvantages Mr. Welter may have faced by the

13   serious felony conviction earlier, he has managed to

14   maintain a very good employment history.

15          I do find in light of all those factors that a

16   sentence -- that a total sentence in this case of 88 months

17   followed by, as to the 399 case, a period of 15 years of

18   supervised release is sufficient but not greater than

19   necessary to -- on the terms and conditions set forth in the

20   presentence report.

21          I find -- Mr. Welter, you're going to have to

22   change the way you do things.  You may be smarter than this

23   Court, you may be smarter than some of the people you are

24   around, but you will not be smarter than the collective

25   wisdom of the probation officer during the period of

US v. Welter - Sentence - May 30, 2013

1   supervised release, and you are simply going to have to be

2   straight up, candid, and honest with the probation office

3   during the period of supervised release.

4           I recognize that that sentence constitutes a

5   variance from the guideline range, but in Mr. Welter's case,

6   as I have indicated, both the types of images as well as the

7   use of the computer, at least in the Court's opinion,

8   sometimes overstate the seriousness of a -- I hesitate to

9   say "simple," but an offense that involves solely the

10  possession of child pornography materials.

11          So that's the sentence that I intend to impose.

12  Ms. Costner, do you wish to be heard further on that

13  sentence?

14          MS. COSTNER:  No, Your Honor.

15          THE COURT:  Mr. Green, I recognize that's

16  different from what you urged on the Court.  I'll hear from

17  you further if you wish to be heard.

18          MR. GREEN:  No, Your Honor.

19          THE COURT:  All right.  Mr. Welter, if you will

20  stand, please, sir.

21          In Count One, Case No. 12CR123, it is hereby

22  ordered that the defendant is committed to the custody of

23  the Bureau of Prisons for a term of 18 months followed by

24  three years of supervised release.  A special assessment of

25  $100 is mandatory, is hereby imposed, and is due and payable

1    immediately.  A fine is waived because of the defendant's

2    inability to pay, and restitution is not imposed as to

3    count -- as to the count in this case.

4           As to Count One of Case No. 12CR399, the defendant

5    is hereby committed to the custody of the Bureau of Prisons

6    for a term of 70 months.  That sentence is imposed to run

7    consecutively to the sentence imposed in Case No. 12CR123

8    followed by 15 years of supervised release, which shall run

9    concurrently with the supervised release imposed as to

10   12CR123.  A special assessment of $100 is mandatory and is

11   hereby imposed in this case for a total of $200.  Those

12   special assessments are due and payable immediately.

13          The Court does recommend to the Bureau of Prisons

14   that the defendant be designated to a facility where he may

15   receive a psychological evaluation and any recommended

16   treatment while in the custody of the Bureau of Prisons,

17   and, furthermore, that he be designated to a facility where

18   he may receive such medical treatment as deemed reasonably

19   necessary by the Bureau of Prisons.

20          During the period of supervised release, it is

21   ordered that the defendant shall comply with the standard

22   terms and conditions of supervised release.  In addition to

23   the standard terms and conditions, the following special

24   conditions are imposed:

25          One, the defendant shall cooperatively participate

1    in an evaluation and a mental health treatment program with

2    emphasis on sex offender treatment and pay for any treatment

3    services as directed by the probation officer.  Treatment

4    may include any physiological testing such as the polygraph

5    and penile plethysmograph and the use of any prescribed

6    medications.

7           Two, the defendant shall not use or possess a

8    computer to access any online computer service at any

9    location, including employment, without the prior approval

10   of the probation officer.  This includes any internet

11   service provider, bulletin board system, or any other public

12   or private computer network.  And it seems to me,

13   Ms. Costner and Mr. Green, I don't intend this provision to

14   cover a standalone, not online, diagnostic computer that may

15   be used solely for purposes of automotive employment if I'm

16   making myself clear.

17          MR. GREEN:  Yes, sir.

18          THE COURT:  This provision is not inclined --

19   imposed to include an automotive diagnostic computer that is

20   not online and is available solely for the purpose of

21   conducting automotive computer diagnostics.

22          Three, if granted access to an online computer

23   service, the defendant shall consent to the probation

24   officer conducting periodic, unannounced examinations of his

25   computer equipment which may include, hardware, software,

1   and copying all data from his computers.  This may also

2   include the removal of such equipment when necessary for the

3   purpose of conducting a more thorough examination.

4            Four, the defendant shall consent to third-party

5   disclosure to any employer or potential employer concerning

6   any computer-related restrictions that have been imposed

7   upon him.

8            Five, the defendant shall provide personal,

9   business, telephone records to the probation officer upon

10  request and consent to the release of certain information

11  from any online, telephone, or similar account.

12           Six, the defendant shall not have any contact

13  other than incidental contact in a public forum such as

14  ordering in a restaurant, grocery shopping, etc., with any

15  person under the age of 18 except for his own children

16  without prior permission of the probation office.  Any

17  approved contact shall be supervised by an adult at all

18  times.  The contact addressed in this condition includes,

19  but is not limited to, direct or indirect, personal,

20  telephonic, written, or through a third party.  If the

21  defendant has any contact with any child, that is, a person

22  under the age of 18 years not otherwise addressed in this

23  condition, the defendant is required to immediately remove

24  himself from the situation and notify the probation officer

25  within 24 hours.

1          Seven, the defendant shall not frequent places

2     where children congregate, that is, parks, playgrounds,

3     schools, video arcades, day care centers, swimming pools, or

4     other places primarily used by children under the age of 18

5     without the prior approval of the probation officer.

6          Six [sic], the defendant shall not view, purchase,

7     possess, or control any sexually explicit materials

8     including, but not limited to, pictures, magazines,

9     videotapes, movies, or any other material obtained through

10     access to any computer or any material linked to computer

11     access or use.  I think I said six.  I think I'm on nine.

12          The defendant shall submit to a search of his

13     person, property, house, residence, vehicle, papers,

14     computer, or other electronic communication or data storage

15     devices or media and effects at any time without a warrant

16     by any law enforcement officer or probation officer with

17     reasonable suspicion concerning unlawful conduct or a

18     violation of a condition of probation or supervised release.

19          And, ten, the defendant shall register with the

20     state sex offender registration agency in each jurisdiction

21     where he resides, is employed, carries on a vocation, or is

22     a student.  The defendant will be required to keep his

23     registration current.  For initial registration only, the

24     defendant must also register in the jurisdiction where he

25     was convicted if he does not reside in that jurisdiction.

1          Mr. Welter, you do have the right to appeal the
2   sentence that I have imposed in this case.  If you choose to
3   appeal, notice of appeal must be filed within 14 days of
4   entry of judgment.  If you wish to appeal and cannot afford
5   the services of counsel, counsel will be appointed to
6   represent you.  Ms. Costner will be responsible for advising
7   you with respect to your right to appeal and filing a notice
8   of appeal if you instruct her to do so.
9          Ms. Costner, anything further?
10          MS. COSTNER:  No, Your Honor.
11          THE COURT:  Mr. Green?
12          MR. GREEN:  A destruction order for the hard
13   drives at the expiration of the period of appeal and an
14   order for return of the firearm to its lawful owner; and if
15   that person cannot lawful possess one, then it be destroyed.
16          THE COURT:  All right.  I will order the
17   destruction of any computer hard drive seized at the
18   conclusion of any appeals period, and I'll order the return
19   of the firearm to a lawful, rightful owner if one can be
20   located upon reasonable efforts, and, if not, the firearm
21   destroyed according to law at the conclusion of any appeals
22   period.
23          All right.  Good luck to you, Mr. Welter.
24              (At 11:36 a.m., proceedings concluded.)
25

US v. Welter - Sentence - May 30, 2013

1                              * * * * *

2                         C E R T I F I C A T E

3

4        I, JOSEPH B. ARMSTRONG, RMR, FCRR, United States

5    District Court Reporter for the Middle District of North

6    Carolina, DO HEREBY CERTIFY:

7           That the foregoing is a true and correct transcript of

8    the proceedings had in the within-entitled action; that I

9    reported the same in stenotype to the best of my ability;

10   and thereafter reduced same to typewriting through the use

11   of Computer-Aided Transcription.

12

13

14

15   Date:   09/30/13          Joseph B. Armstrong, RMR, FCRR
                               United States Court Reporter
16                             324 W. Market Street
                               Greensboro, NC  27401
17

18

19

20

21

22

23

24

25

US v. Welter - Sentence - May 30, 2013